IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.     ) | Criminal No. 1:20-mj-00346 |
| ) | Hon. Michael S. Nachmanoff |
| MAJED TALAT HAJBEH,   ) | |
| a/k/a "Abu Khaled"   ) | |
| ) | |
| Defendant.  ) | |

**DEFENDANT'S MOTION FOR
RECONSIDERATION OF DETENTION ORDER**

Defendant Majed Hajbeh, through counsel, and pursuant to 18 U.S.C. § 3145(b), moves this Court to reconsider the order of detention issued on December 11, 2020. Mr. Hajbeh also respectfully requests an expedited hearing of this matter pursuant to 18 U.S.C. § 3145(b), which requires that such motions be determined "promptly."

**BACKGROUND**

Mr. Hajbeh was arrested on December 8, 2020, based on a criminal complaint charging him with transportation of child pornography, 18 U.S.C. §§ 2252(a)(1), (b)(1). Mr. Hajbeh waived his right to a preliminary hearing, and the Court determined that probable cause supported Mr. Hajbeh's arrest.

On December 11, 2020, the Court held a detention hearing. The government argued that Mr. Hajbeh should be detained pretrial, noting the presumption in favor of detention in this case. Mr. Hajbeh requested that he be released on bond, which this Court denied. The Court issued an order of detention pending trial, upon the government's motion pursuant to 18 U.S.C. § 3142(f)(1). On December 20, counsel received notice that two inmates at the Alexandria Detention Center (ADC), where Mr. Hajbeh is detained, have tested positive for COVID-19 and

1

the facility has been locked down for, at minimum, ten days. Mr. Hajbeh now requests that this Court reconsider the detention order and order that he be released from custody as soon as practicable.

## ARGUMENT

Section 3142(f)(2) of Title 18 provides that a detention hearing "may be reopened, . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." Mr. Hajbeh respectfully requests that the Court reopen the detention hearing based on new evidence of the particularly dangerous conditions of confinement at the ADC due to the COVID-19 pandemic; additional evidence tending to establish that he is not a flight risk; and new considerations indicating that he does not pose a danger to the community, including safety precautions his family has already undertaken.

I. **The Court Must Consider All Reasonable Less Restrictive Alternatives to Detention.**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Accordingly, the Bail Reform Act of 1984 provides that a defendant must be released on their personal recognizance or an unsecured personal bond "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b); *accord United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

Under circumstances in which a personal recognizance bond is insufficient, the officer must choose "the least restrictive further condition, or combination of conditions, that such

judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(c)(1)(B). *see, e.g.*, *United States v. Infelise*, 934 F.2d 103, 105 (7th Cir. 1991) (holding that under 18 U.S.C. § 3142(e) defendants on racketeering charges were entitled to further consideration of electronic ankle bracelets, rather than continued detention, as a lesser restrictive condition) (Posner, J.). In other words, the Court must consider all reasonable less restrictive alternatives to detention. *See* 18 U.S.C. § 3142(e). Moreover, conditions set upon release are intended to be preventative and not punitive in nature. *Salerno*, 481 U.S. at 747 (evaluating the legislative history of 18 U.S.C. § 3142). In sum, the Bail Reform Act does not modify or limit the presumption of innocence. *See* 18 U.S.C. § 3142(j).

Even in a case such as this where a rebuttable presumption arises that no such conditions of release exist, *see* 18 U.S.C. § 3142(e), this statutory presumption shifts "the burden of production to the defendant, but the burden of persuasion remains with the government." 3B Wright & Miller, Federal Practice & Procedure § 765.1. In other words, the presumption requires "that the defendant introduce 'some evidence' to the contrary" that no conditions exist that will reasonably ensure the safety of the community and the defendant's appearance. *See United States v. O'Brien*, 895 F.2d 810, 815 (1st Cir. 1990); *see also United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990) ("The defendant's obligation to come forward with evidence does not shift to the defendant the government's burden of persuasion.").

Here, however, the safety of the community and the assurance of Mr. Hajbeh's appearance are supported by Mr. Hajbeh's relationship with his family, his immigration status, his cooperation with law enforcement, and his willingness to comply with Court imposed conditions of pretrial supervision.

### A. Pretrial Detention is Not Appropriate in this Case Given the Particular Risk of Contracting COVID-19 at ADC.

In light of the COVID-19 pandemic, it is particularly dangerous and burdensome to impose pretrial detention, as doing so increases a person's potential exposure to a deadly virus. This is especially true when inmates are detained at facilities such as ADC, which report that COVID-19 is present and spreading among inmates.

Conditions at ADC have necessitated a full, 10-day lockdown at the facility. On Sunday, December 20, 2020, counsel received notification from U.S. Marshal Nick E. Proffitt that ADC had locked down because at least two federal inmates had tested positive for COVID-19. According to Proffitt, "[t]he proximity and contact that those inmates have had in the facility necessitate a temporary lockdown while the response, isolation, and mitigation efforts begin." The lockdown at the ADC indicates a real and present threat that Mr. Hajbeh will be exposed to, and potentially contract, the coronavirus the longer that he remains detained.

Mr. Hajbeh is at high risk for severe illness should he contract COVID-19. He has a number of underlying medical conditions, including high cholesterol, thyroid issues, and a prostate infection, and his daughter reports that he had the coronavirus several months ago. He also has a body mass index of 38 $kg/m^2$, making him obese according to Centers for Disease Control and Prevention (CDC) guidelines. *See* Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions: Obesity* (last updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity. This medical history makes him more likely to develop severe illness if he is to contract COVID-19 again, *see id.*, and given the prevalence of COVID in jails and prisons around the country—including at the ADC—the odds of Mr. Hajbeh contracting the virus increase exponentially as he continues to be detained.

This Court should order that Mr. Hajbeh be released as soon as ADC's 10-day quarantine period expires. Though counsel understands that keeping Mr. Hajbeh detained for this quarantine period is necessary to prevent the virus from spreading beyond the ADC, any additional period of detention increases his risk of infection. This is especially true given the conditions inside detention centers, which make it challenging, if not impossible, for inmates to comply with CDC infection prevention guidelines such as social distancing and using personal protective equipment.

Given the presence of COVID-19 at the ADC and his underlying health conditions, Mr. Hajbeh should be released as soon as is practicable, consistent with federal policy that encourages reducing the number of people in federal custody during the COVID-19 pandemic. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020) (expanding the Bureau of Prisons' authority to release inmates from federal facilities, placing them on home confinement); Memorandum from Attorney General William Barr to Director of Bureau of Prisons, "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic" (Mar. 26, 2020) (directing the Bureau of Prisons to "prioritize the use of [] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic").

II. **Conditions Exist That Will Reasonably Ensure the Appearance of Mr. Hajbeh as Required and the Safety of the Community**.

As the pretrial services officer recommended in the Pretrial Services Report, Mr. Hajbeh can be safely released on an unsecured bond, subject to conditions that assure Mr. Hajbeh's appearance at future Court proceedings and the safety of the community.

### a. Mr. Hajbeh Is Not a Flight Risk.

With respect to reasonably assuring Mr. Hajbeh's appearance, ample evidence demonstrates that conditions exist to address and alleviate any risk of flight.

The Pretrial Services Report cites two potential risks when assessing Mr. Hajbeh's risk of nonappearance, but neither of these supports a finding that Mr. Hajbeh is a flight risk: (1) Mr. Hajbeh has ties to a foreign country; and (2) Mr. Hajbeh is under an order of removal by U.S. Immigration and Customs Enforcement. In addition, the government asserts that the potential penalties for the charged offense provide Mr. Hajbeh with the incentive to flee. Upon further scrutiny, none of these reasons actually support a finding that Mr. Hajbeh is a flight risk or nonappearance risk.

First, although Mr. Hajbeh's mother and other members of his family live in Jordan, these ties are not sufficient reason to believe he would leave the United States, given that he fears being incarcerated and tortured by government officials in Jordan if he is ever to return to that country. Furthermore, as documented in the Pretrial Services Report, Mr. Hajbeh is present in the United States on a work permit. His passport is currently with immigration officials, not in his possession, and he does not possess any documents that allow him to travel internationally. Therefore, although he is a citizen of Jordan, it would be exceedingly challenging for Mr. Hajbeh to leave the United States even if he wanted to or felt safe doing so.

Second, Mr. Hajbeh has been under immigration supervision since 2005. He has not been deported from the United States because the conditions in Jordan and Israel have precluded his deportation. Instead, he has been permitted to live and work in the United States and has not left the country since 1997. Immigration officials report that Mr. Hajbeh has been reporting as directed to immigration supervision meetings, complying with the conditions of his supervision.

Rather than suggesting a risk of nonappearance, his immigration status and compliance with immigration officials indicates that it is less likely that Mr. Hajbeh poses a flight risk.

Finally, the government asserts that the mandatory five years imprisonment and potential guidelines range of 151-188 months incarceration provide incentives for Mr. Hajbeh's potential failure to appear, but the opposite is true. Given the potentially severe penalties for the charged offense, Mr. Hajbeh is incentivized to continue cooperating to the fullest extent with the government in their investigation, as he has done, in order to mitigate the possibility that such a severe sentence will be imposed. When he was made aware of the investigation into his conduct in June, he did not flee, but instead sought counsel. Similarly, since the beginning of his immigration proceedings and for the duration of his immigration supervision, he has cooperated with immigration officials. His conduct thus far demonstrates his willingness to cooperate and the unlikelihood of his flight.

Considering the circumstances in support of Mr. Hajbeh's continued appearance and cooperation, imposing the conditions as recommended in the Pretrial Services Report will sufficiently ensure that Mr. Hajbeh continues to appear for proceedings in this matter. This Court can require that Mr. Hajbeh restricts his travel to the Washington, D.C. metropolitan area, or further, that Mr. Hajbeh be restricted to only his place of residence except for medical necessities and court appearances. Furthermore, this court can prohibit Mr. Hajbeh from obtaining any travel documentation that would facilitate his leaving the state or country. To provide for additional supervision over Mr. Hajbeh's movement, this Court could mandate additional reporting obligations with pretrial services as well as GPS monitoring. It should be noted, as well, that the conditions of the ongoing COVID-19 pandemic provide a significant deterrent should Mr. Hajbeh even consider traveling without prior authorization. Given his underlying medical

conditions and his heightened risk of severe illness, traveling puts Mr. Hajbeh at a great and unnecessary health risk. As such, it is even less likely that Mr. Hajbeh poses a flight risk.

As this court noted at the detention hearing, in prior cases—whether it be ICE proceedings, criminal proceedings, or civil habeas proceedings—Mr. Hajbeh "showed up when he was asked to show up." Especially if conditions of release are imposed, there is no reason to believe he would not continue to do so in this case.

      b. **Mr. Hajbeh Is Not a Threat to the Community.**

With respect to the safety of the community, the Court should consider several factors and conditions that demonstrate how Mr. Hajbeh does not pose a present threat to the community in any way.

As noted above, two inmates at ADC have tested positive for COVID-19, and Mr. Hajbeh has been placed into a 10-day quarantine. Unless Mr. Hajbeh tests positive for COVID-19 in the next ten days, it will be safe for him to leave ADC when the quarantine period ends. His continued detention, on the other hand, increases both his and other inmates' risk of contracting COVID-19 and experiencing serious illness. He is expected to be tested for COVID-19 at ADC, and if his results are negative, he would pose no risk of transmitting COVID-19 to members of the community if released. Furthermore, reducing the number of people detained at ADC will make it less likely that the coronavirus will spread among inmates, as inmates will be able to socially distance more effectively.

The Pretrial Services Report cites two potential concerns when assessing Mr. Hajbeh's potential danger to the community, which the government reiterated during the detention hearing: (1) the nature of the instant offense; and (2) third-party risk to future employers due to the nature of the offense. Mr. Hajbeh submits that though serious, the allegations against him do

not warrant a finding that his release would pose a danger to the community, and in fact, multiple conditions exist to overcome the presumption in favor of his detention.

The nature of the allegations in this offense does not indicate that members of his community are at risk of being harmed should Mr. Hajbeh be released. There is no allegation that the instant offense involved weapons or violence of any kind, and importantly, there are *no allegations of physical sexual contact with minors* contained in the FBI agent's affidavit or criminal complaint. The government alleges that Mr. Hajbeh accessed child pornography at the residences of students. But given that there are no allegations of Mr. Hajbeh's sexual contact with minors, these allegations do not indicate the presence of a threat to members of the community. As there was no direct threat of harm to the students and families who employed Mr. Hajbeh prior to his arrest, there is certainly no threat of harm to those employers now that Mr. Hajbeh has received notice of the Court's desire that he refrain from conducting lessons with children.[1] In any event, the conditions of release described below, such as house arrest, GPS monitoring, and prohibiting Mr. Hajbeh from attending in-person lessons, would effectively eliminate any potential risk that might have existed when Mr. Hajbeh attended these lessons.

Mr. Hajbeh's limited criminal history also supports the conclusion that Mr. Hajbeh is not a danger to the community. Mr. Hajbeh is not a career criminal. His record contains only one

---

[1] To the extent that this Court is concerned about Mr. Hajbeh's continuing to conduct lessons with children after the FBI search of his devices, it is worth noting that Mr. Hajbeh was never informed that he should discontinue these lessons. In fact, early discovery corroborates that when law enforcement agents interviewed Mr. Hajbeh in June, they were aware of a tutoring appointment scheduled for later that day. Rather than advise him to permanently discontinue his instruction, when it became apparent that the interview would last into the lesson time, the agents asked whether he needed to contact the student to postpone or cancel the day's lesson. Furthermore, Mr. Hajbeh requested, and the agents provided, contact information for other students from Mr. Hajbeh's seized phone. Acting on the information the agents were aware of the scheduled lesson and request for students' contact information, Mr. Hajbeh reasonably believed that because he was not instructed otherwise, his attendance at the lessons was not prohibited.

misdemeanor conviction for solicitation without a license, resulting in a fine of just $35, and a charge of possession of false documents from 2003, for which he was acquitted by a jury.

Although Mr. Hajbeh has not and does not pose a threat to members of the community or any of the students with whom he has worked, the conditions suggested in the Pretrial Services Report are more than sufficient to alleviate this Court's concern regarding Mr. Hajbeh's "dangerousness" and reasonably assure the safety of the community.

In addition to ordering that Mr. Hajbeh reside with a suitable third-party custodian and placing restrictions on his travel and movement, this Court can order that Mr. Hajbeh not have any contact with minor children outside the presence of pre-approved adults. This Court can also require that Mr. Hajbeh refrain from maintaining his self-employment or holding any teaching positions, and that he participate in sex offender evaluation and treatment programming as directed by pretrial services. Moreover, this Court can require that Mr. Hajbeh not access computers or the internet without installing monitoring software on his devices, and that he refrain from using any devices that would permit him to contact or share data with others. These conditions will sufficiently ensure that Mr. Hajbeh does not engage in any of the conduct as described in the complaint and affidavit, and such conditions will further promote the safety of members of his community.

As established in the Pretrial Services Report, Mr. Hajbeh's supportive family and their third-party custodianship would contribute to the successful monitoring of Mr. Hajbeh if released. Mr. Hajbeh lives with his wife and six children in the home they have rented for the past seven years. His adult daughter, Maryam Al Hajebi, has indicated her willingness and capacity to serve as a third-party custodian for her father, and Pretrial Services has deemed her to be a suitable custodian. Ms. Al Hajebi has agreed to permit Mr. Hajbeh to continue living at the

family's Woodbridge home, which will be firearm-free should Mr. Hajbeh be released. Ms. Al Hajebi does not use alcohol or drugs, has no prior criminal record, and is a nursing student employed on a part-time status. She is an ideal custodian for Mr. Hajbeh, and the living arrangement proposed also allows for electronic monitoring and home confinement should the court order stringent conditions of release. Ms. Al Hajebi and Ms. Hajbeh's other children contribute financially to their parents and help to maintain their family's home, which they will continue to do throughout Mr. Hajbeh's case.

Furthermore, Ms. Al Hajebi reported that Mr. Hajbeh's two youngest children, who are minors, have been staying with their adult brother since Mr. Hajbeh's arrest. Undersigned counsel has confirmed with the brother that the minor children are welcome to remain with their brother for the duration of Mr. Hajbeh's case should the Court order that Mr. Hajbeh cannot reside with his minor children. That Mr. Hajbeh and his family have already taken this precaution demonstrates how Mr. Hajbeh is certain to comply with any additional conditions imposed by this Court limiting or prohibiting his contact with other children.

Given Mr. Hajbeh's conduct, cooperation with authorities, supportive family, and conditions of release that this Court could impose, it is clear that he does not pose a threat of danger to his community.

## CONCLUSION

In sum, this is not a case where detention is required under the provisions of the Bail Reform Act. Pretrial release conditions, including third-party custodianship, electronic monitoring, and additional conditions this Court chooses to adopt, are more than sufficient to safeguard the community and ensure that Mr. Hajbeh appears in Court.

WHEREFORE, Mr. Hajbeh respectfully requests that this court set this matter for an expedited hearing during the week of December 28, 2020, or as soon thereafter as is practicable, to reconsider its bond determination in this matter, and set appropriate conditions of release.

        Respectfully submitted,

        MAJED TALAT HAJBEH
        By Counsel

        _____/s/_____
        Brooke S. Rupert, 79729
        Attorney for Majed Hajbeh
        Office of the Federal Public Defender
        1650 King Street, Suite 500
        Alexandria, Virginia 22314
        Telephone: 703.600.0849
        Fax: 703.600.0880
        Brooke_rupert@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2020 I will file the foregoing pleading with the Clerk of the Court and will provide a copy of that filing to counsel of record.

A courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the filing.

              _____/s/_____
              Brooke S. Rupert, 79729
              Attorney for Majed Hajbeh
              Office of the Federal Public Defender
              1650 King Street, Suite 500
              Alexandria, Virginia 22314
              Telephone: 703.600.0849
              Fax: 703.600.0880
              Brooke_rupert@fd.org